**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

             v.                                         17-CR-05-A
                                                        **DECISION AND ORDER**

MICHAEL ELDER,

                Defendant.
_____

       This case is before the Court on the Government's objections to Magistrate Judge Jeremiah J. McCarthy's Report and Recommendation, which recommends suppressing evidence recovered from a warrantless search of the Defendant's home. For the reasons stated below, the Court adopts the Report and Recommendation in some respects and declines to adopt the Report and Recommendation in other respects. The Court therefore denies the Defendant's motion to suppress.

## DISCUSSION

       The Court assumes familiarity with the facts of this case, which Judge McCarthy's Report and Recommendation sets forth in detail. In brief, the Defendant began serving a five-year term of federal supervised release in July 2016. Within two months of his release, the Drug Enforcement Administration (DEA) began receiving anonymous tips alleging that the Defendant was selling heroin and fentanyl from his home. Each of the tips DEA received was relatively vague, none contained any predictive information, and neither the DEA nor the Defendant's Probation Officer attempted to verify any of the information in the tips.[1] Based on the tips, several U.S. Probation Officers and DEA

---

[1] The first tip stated: "federal probation officer James Dyckman to tap this phone number 917 957 [xxxx], if you want heroin off the buffalo streets." Ex. 1. James Dyckman is the Defendant's Probation Officer. Officer

1

agents searched the Defendant's home and found a digital scale, "multiple bags of compressed powder," and three "kilo presses."[2]

The Court agrees with Judge McCarthy that the anonymous tips did not, individually or collectively, support a finding of reasonable suspicion. This is a close question—for instance, one tip references the name of the Defendant's Probation Officer, suggesting a familiarity with the Defendant and his activities. However, none of the information contained in the tips was verified and none of it was predictive. Moreover, none of the tipper's identities is known, and there is therefore was no way of knowing whether four people sent four tips, or if, instead, one person sent four tips. And, finally, nothing in the Defendant's background or history of supervision suggested that he might,

---

Dyckman testified that the phone number in the tip was not the phone number the Defendant had provided to the Probation Office.

The second tip stated: "Michael Elder 143 Edgewood tondowanda ny [sic], this guy is dealing heroin to our neighborhood. I live on this street, expensive cars in and out of this address, large boxes being delivered stuffed with heroin. How many overdoses must occur before my street is safe from a well-known fentanyl dealer?" Ex. 3.

The third tip stated: "I live in this community. The government pretends to care about people's well-being. How many overdoses need to occur before something is done? I guess I shouldn't care either." Tr. 52:9-12.

And the fourth tip stated: "If you raid Michael Elder residence at 143 Edgewood, you'll find drugs, heroin, Fentanyl underneath the cabinets next to the stove." Tr. 52:13-16.

[2] According to one of the DEA agents who conducted the search, a "kilo press" is "basically a hydraulic floor jack connected to a collar that's the shape of a small box." Tr. 69:13-16. The user "put[s] powder in" the jack, "put[s] the top on and jack[s] [the] jack up [to] make . . . a block of drugs." Tr. 69:16-18.

upon release, become involved in drug trafficking.³ Thus, either individually or collectively, these tips do not amount to reasonable suspicion.⁴

The Court disagrees, however, with Judge McCarthy's conclusion that the search needed to have been supported by reasonable suspicion. The Probation Officer testified that he was only permitted to search the Defendant's house if he had reasonable suspicion to do so. That conclusion was incorrect. The terms of the Defendant's supervised release include a search condition, but that search condition does *not* require reasonable suspicion. Instead, the search condition states, in its entirety, that "[t]he defendant shall submit to a search of his person, property, vehicle, place of residence or any other property under his control and permit the confiscation of any evidence or contraband discovered." Docket No. 23-1 at 4. Thus, the search condition in this case authorizes suspicionless searches.

The law is not clear on whether the Fourth Amendment permits a person on federal supervised release to be subject to suspicionless searches.⁵ In *United States v. Knights,* the Supreme Court held that, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough

---

³ The Defendant's underlying conviction was for bank robbery, and he has no prior charges or convictions related to narcotics. While on supervised release, the Defendant was employed, he did not test positive for drugs, and, to the Probation Officer's knowledge, he had not violated any condition of his supervised release. Finally, the Probation Officer had visited the Defendant's house on two or three occasions before the search at issue, and the record does not suggest that the Probation Officer found any contraband during those visits.

⁴ "That the allegation[s]" in the tips "turned out to be correct does not suggest that the officers, prior to the [search], had a reasonable basis for suspecting [the Defendant] of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000).

⁵ While the search in this case was not supported by reasonable suspicion, the search was not entirely without suspicion. The anonymous tips suggested, at the very least, that the Defendant was engaged in conduct that others either knew or believed was criminal. However, the Government has justified the search based largely on the terms of the Defendant's supervised release, which require no suspicion.

likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." 534 U.S. 112, 121 (2001). *Knights*, however, expressly reserved decision on the question whether a search that is unsupported by "any individualized suspicion" would satisfy the Fourth Amendment. *Id.* at 120 n.6. Like *Knights*, the Second Circuit has held that "[p]robationary searches—whether for law enforcement or probationary purposes—are acceptable . . . if based upon reasonable suspicion (or potentially a lesser standard)." *United States v. Lifshitz*, 369 F.3d 173, 181 (2d Cir. 2004). But the Second Circuit has not yet clarified whether a search of a federal supervisee may be based on a "lesser standard" than reasonable suspicion. *See United States v. Chirino*, 483 F.3d 141, 150 (2d Cir. 2007) (McLaughlin, J., concurring) (arguing that "something less than reasonable suspicion may support a search of the dwelling of a felon on probation," and urging the Second Circuit to resolve the question). *See also United States v. Washington*, No. 12 Cr. 146(JPO), 2012 WL 5438909, at *6 n.4 (S.D.N.Y. Nov. 7, 2012) (concluding that search was supported by reasonable suspicion and, as a result, declining to address "the open question whether a lesser standard may be appropriate in the supervised release context"). Thus, at present, there appears to be no binding authority addressing whether a federal probation officer may search a supervisee's home based on something less than reasonable suspicion.

In a closely-related context, however, the Supreme Court has provided guidance that helps resolve this case. In *Samson v. California*, 547 U.S. 843 (2006), the Court considered whether a California statute permitting suspicionless searches of parolees

was consistent with the Fourth Amendment.[6] This required the Court to assess "'the totality of the circumstances'" surrounding the search "by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which [the search] is needed for the promotion of legitimate governmental interests.'" *Id.* at 848 (quoting *Knights*, 534 U.S. at 118-19). Parolees, the Court observed, "have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850 (quoting *Knights*, 534 U.S. at 119). After balancing that diminished expectation of privacy against the state's "substantial" interest in supervising parolees, *id.* at 853, the Court concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 857.

*Samson* is particularly relevant to this case because of how the Supreme Court treated parole for Fourth Amendment purposes. The Court observed that, on the "'continuum' of state-imposed punishments," parole "is more akin to imprisonment" than it is to probation. *Id.* at 850. Then—as is critical here—the Supreme Court cited the Second Circuit's decision in *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002), for the proposition that "federal supervised release, . . . in contrast to probation, is meted out in addition to, not in lieu of, incarceration." (quotation marks omitted). Parole, the Court observed, is similar: "'The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance

---

[6] *Samson* was decided on the understanding that the California statute did not permit "'arbitrary, capricious or harassing' searches." *Samson*, 547 U.S. at 856. Although the search in this case was not supported by reasonable suspicion, there is absolutely no suggestion that it was arbitrary, capricious, or harassing.

5

of the sentence.'" *Samson*, 547 U.S. at 850 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972)).

*Samson* therefore appears to suggest that a federal supervisee is, for Fourth Amendment purposes, little different than a parolee. Supervised release and parole are, in many ways, both an extension of prison. "Like parole, supervised release is a term of supervision following incarceration." *Reyes*, 283 F.3d at 458. But supervised release also "differs from parole in an important respect: 'unlike parole, supervised release does not replace a part of a term of incarceration, but instead is . . . given *in addition to* any term of imprisonment imposed by a court.'" *Id.* (quoting 1 Neil P. Cohen*, The Law of Probation and Parole* § 5:11, at 5-22 (2d ed. 1999)) (ellipsis and emphasis in *Reyes*). Thus, the "totality of the circumstances pertaining" to a person's "status" as a federal supervisee demonstrates that a supervisee's expectations of privacy are not ones "that society would recognize as legitimate." *Samson*, 547 U.S. 851. In particular, "[i]t is beyond doubt that [a supervisee's] actual expectation of privacy in the environs of his home [is] necessarily and significantly diminished because [he] [is] a convicted person serving a court-imposed term of federal supervised release that mandate[s] home visits 'at any time' from his federal probation officer." *Reyes*, 283 F.3d at 457.[7] This limited expectation of privacy is even further reduced where—as in this case—a defendant's term

---

[7] The United States Sentencing Commission "recommend[s]" that a sentencing court impose, among other conditions of supervised release, the condition that the defendant "allow the probation officer to visit the defendant at any time at his or her home or elsewhere," and that the defendant "permit the probation officer to take any items prohibited by the conditions of the defendant's supervision that he or she observes in plain view." U.S.S.G. § 5B1.3(c)(6) (2016). *See also* U.S.S.G. § 5B1.3(c)(9) (2005) (recommending substantively identical condition at time of Defendant's sentencing); *In the Matter of Revised Standard Conditions of Probation and Supervised Release* (W.D.N.Y. Apr. 4, 2017) (on file with Clerk of Court) (establishing home-visit condition as one of the "standard conditions of probation and supervised release in the Western District of New York").

6

of supervised release includes, in addition to a home-visit condition, a condition permitting the Probation Officer to search the defendant's home for contraband.[8]  Taken together, this means that the average federal supervisee has a "diminished expectation of privacy that is inherent in the very term '*supervised* release.'"  Id. at 461 (emphasis in original).

Balanced against a supervisee's lowered expectation of privacy is the Probation Officer's "responsibilit[y] . . . to ensure that a convicted person under supervision does not again commit a crime."  Id. at 459.  Indeed, a Probation Officer is "*required* to investigate the 'conduct and condition' of a supervisee by, *inter alia*, undertaking 'at any time' a home visit to determine whether the supervisee is violating the terms of his supervised release, including the condition that he not commit any further crimes."  Id. at 460 (citing 18 U.S.C. § 3603(2)) (emphasis added).  And a Probation Officer has a "duty . . . to investigate whether a [supervisee] is violating the conditions of his" supervised release, *Reyes*, 283 F.3d at 459, one of which is the mandatory condition that a supervisee "not unlawfully possess a controlled substance."  18 U.S.C. § 3583(d).  A Probation Officer, in other words, has an affirmative responsibility to ensure that a person under his supervision is complying with both the law and the conditions of supervised release.  *See also* 18 U.S.C. § 3603(3) ("A probation officer shall use all suitable methods, not inconsistent with the conditions specified by the court, to aid a probationer or a person on supervised release who is under this supervision, and to bring about improvements in his conduct and conditions.")

---

[8] The Court only considers the privacy expectations of a supervisee whose supervised release includes a search condition.

To effectively fulfill this responsibility, a Probation Officer needs, in the vast majority of cases, the ability to conduct searches like the one in this case. If a search "is to be effective and serve as a credible deterrent, unannounced . . . inspections are essential," and if a Probation Officer must wait until he has reasonable suspicion to perform a search, his ability to do his job "could easily [be] frustrate[d]." *United States v. Biswell*, 406 U.S. 311, 316 (1972) (addressing Fourth Amendment implications of regulatory searches). This is because "[i]mposing a reasonable suspicion requirement would give" supervisees "greater opportunity to anticipate searches and conceal criminality." *Samson*, 547 U.S. at 854. After all, like parolees, supervisees are "'more likely to commit future criminal offenses.'" *Samson*, 547 U.S. at 853 (quoting *Pa. Bd. of Probation and Parole v. Scott*, 534 U.S. 357, 365 (1998). In other words, it is important to not lose sight of the fact that, if a Probation Officer is supervising someone whose sentence includes a search condition, the Probation Officer is likely not supervising a petty criminal. This reality must be factored into the Court's assessment of a Probation Officer's interest in conducting suspicionless searches.

Thus, although the search in this case was not supported by reasonable suspicion, the Court concludes that the Probation Officer needed *no* suspicion to conduct the search. This conclusion "follows from *Samson*," *United States v. Jackson*, 866 F.3d 982, 985 (8th Cir. 2017), and *Reyes*: *Samson* approved suspicionless searches of parolees, and *Reyes* recognized that federal supervision is functionally no different than parole. *See also id.* at 985 ("[The Eighth Circuit] ha[s] said that supervised release is a more severe punishment than parole and probation, and involves the most circumscribed expectation of privacy.") (quotation marks omitted). Several courts of appeals have relied on *Samson*

to reach this or a similar conclusion. *See id.* at 984-85 (relying on *Samson* to allow search of supervisee's cell phone without regard to whether reasonable suspicion existed). *Cf. United States v. Taylor*, 482 F.3d 315, 319 n.2 (5th Cir. 2007) (in case involving state supervisee, noting that *Samson* may have "eliminated" the "reasonableness requirement" in a supervised release search).[9] The Court therefore concludes that the search in this case complied with the Fourth Amendment.

In addition to considering whether the search in this case complied with the Fourth Amendment, Judge McCarthy also concluded (1) that the Defendant's "stalking horse" argument is "'not a valid defense in this Circuit,'" Docket No. 29 at 8 (quoting *Reyes*, 283 F.3d at 463); and (2) that the public-safety exception to *Miranda* permitted a DEA agent to ask the Defendant, after recovering suspected drugs from the Defendant's kitchen, whether "anything in [suspected drugs] [is] going to hurt [the agent]?"

The Court adopts both of these recommendations, and it would do so regardless of the standard of review.[10] As Judge McCarthy observed, *Reyes* foreclosed the "stalking horse" theory in the Second Circuit. In addition, the agent's un-*Mirandized* question to the Defendant was entirely justified given (1) that the Defendant's home was being

---

[9] The Court recognizes that *Reyes* was limited to home visits—"a far less invasive form of supervision than a search." *Reyes*, 283 F.3d at 462. Specifically, *Reyes* held that, "[b]ecause home visits 'at any time' are conducted pursuant to a *court-imposed condition* of federal supervised release of which the supervisee is aware, and because a home visit is far less intrusive than a *probation search*, probation officers conducting a *home visit* are not subject to the reasonable suspicion standard applicable to *probation searches* under *Knights*." *Id.* at 462 (all emphasis in original). This case is, of course, different than *Reyes*: Although the Defendant is subject to the same home-visit condition that was imposed in *Reyes*, the Government has not attempted to justify the search on that basis. *Samson*, however—which was decided after *Reyes*—seems to eliminate *Reyes*' distinction, for Fourth Amendment purposes, between home visits and searches.

[10] The Defendant does not object to either of these recommendations. A district court "may adopt those portions of a report and recommendation to which no objections have been made, as long as no clear error is apparent from the face of the record." *United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009).

9

searched, in part, because DEA agents believed it contained fentanyl; (2) the agent's descriptions of the dangers posed by merely coming into contact with fentanyl, Tr. 64:1 – 65:22; and (3) the fact that the agent asked a focused question, about evidence he had just recovered, that was designed to elicit a simple answer, rather than incriminating evidence. *See generally New York v. Quarles*, 467 U.S. 649 (1984); *United States v. Reyes*, 353 F.3d 148 (2d Cir. 2003).

## CONCLUSION

For the reasons stated above, the Court adopts Judge McCarthy's Report and Recommendation in part and declines to adopt the Report and Recommendation in part. The Defendant's motion to suppress (Docket No. 6) is therefore denied in its entirety. The parties shall appear on February 15, 2018 at 9:00 a.m. for a meeting to set a date for a trial or plea.

**SO ORDERED.**

Dated: February 13, 2018            *s/Richard J. Arcara*
    Buffalo, New York           HONORABLE RICHARD J. ARCARA
                                                    UNITED STATES DISTRICT JUDGE