UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————————

UNITED STATES OF AMERICA

                                         Plaintiff,

                                                            **DECISION AND ORDER**
                    v.                                      17-CR-05-A

MICHAEL ELDER,

                                         Defendant.
———————————————————————————


     Before this Court are a thirteen different *pro se* motions filed by Defendant

Michael Elder, following a 2018 jury verdict convicting him of the three drug trafficking

crimes with which he was charged. Those *pro se* motions include the following: (1) a

motion for the return of seized property (Dkt. 109); (2) a motion to compel the

government to produce information and documents (Dkt. 110);[1] (3) a motion to vacate,

set aside, or correct his sentence under 28 U.S.C. § 2255 (Dkt. 125, 127);[2] and (4) a

_____

[1] Related to this *pro se* motion to compel, is a subsequently filed *pro se* "motion to grant" this motion to compel. Dkt. 116.

[2] Related to this *pro se* § 2255, are the following subsequently filed *pro se* motions: (1) a motion to compel a response to §2255 motion (Dkt. 131); (2) a motion for extension of time to file a reply to the government's response to his §2255 motion (Dkt. 137); (3) a motion for release from custody pending resolution of his §2255 motion (Dkt. 138); (4) a motion seeking to supplement or amend his previously filed §2255 motion (Dkt. 142); (5) a motion to compel a response to his motion seeking to supplement or amend his previously filed §2255 motion (Dkt. 143); and (6) a motion to expedite a decision on his §2255 motion (Dkt. 167).  In addition to the foregoing, Elder also filed a *pro se* motion seeking the appointment of counsel to assist him in his §2255 motion. Dkt. 126. Subsequently, however, Elder filed *pro se* "motion to withdraw his motion to appoint counsel." Dkt. 132.

motion for compassionate release (Dkt. 144).   For the reasons which follow, all but one of Elder's pending *pro se* motions are **DENIED**.[3]

## I.    <u>BACKGROUND</u>

On July 25, 2018, the defendant was convicted by a jury of all counts of a 3-count Indictment which charged him: in Count 1, with unlawfully possessing with intent to distribute 28 grams or more of containing cocaine base, in violation of 21 U.S.C. §841(a)(1) and 21 U.S.C. §841((b)(1)(B); in Count 2, unlawfully possessing with intent to distribute fentanyl; butyryl fentanyl; and furanyl fentanyl, in violation of 21 U.S.C. §841(a)(1) and 21 U.S.C. 841(b)(1)(C); and in Count 3, with unlawfully using and maintaining the premises at 143 Edgewood Avenue in Tonawanda, New York, for the purpose of manufacturing, distributing and using cocaine base, fentanyl, butyryl fentanyl, and furanyl fentanyl, in violation of 21 U.S.C. §856(a)(1). Dkt. 95, p. 4.  Much of the evidence against Elder came from a November 3, 2016, search which was conducted at his Edgewood Avenue residence.  During that search, law enforcement officers found, *inter alia*, 92.7 grams of cocaine base, and 117.8 grams of fentanyl. Dkt. 95, p. 7.  Such search, which was conducted by law enforcement agents and members of the United States Probation Office (USPO).  At the time of the search, Elder was serving a term of supervised release which had been imposed as part of

---

[3] On March 26, 2024, this Court entered a Decision and Order (Hereinafter "D&O") (Dkt. 163) which granted, in part, a motion to reduce Elder's sentence pursuant to 18 U.S.C. §3582(c)(2). Dkt. 155.  Specifically, this Court, based upon the applicability of Guidelines Amendment 821 (eliminating the award of status points under Guideline §4A1.1(e)), reduced Elder's previously imposed sentence from a term of imprisonment of 210 months to 187 months. Dkt. 163.

sentence he received following his 2005 convictions for firearms offenses and bank robbery. Dkt. 108, p. 2.

After his release from prison on his bank robbery conviction, Elder, on July 7, 2016, was placed on supervised release. Dkt. 88 at ¶ 7. On that date, Elder met with USPO Officer James Dyckman and acknowledged his understanding and receipt of the conditions of supervised release. *Id*. On August 31, September 18, October 19, and October 21, 2016, the Drug Enforcement Administration ("DEA") received anonymous "tips" regarding allegations of the defendant's drug distribution from his Edgewood Avenue residence. *Id*. at ¶ 8. The DEA notified the USPO, and based on the information provided, the USPO decided to search the Elder's home. *Id*.

On November 3, 2016, the USPO, accompanied by DEA agents, searched Elder's Edgewood Avenue residence. *Id*. at ¶ 9. At that time, Elder was home alone and appeared to be preparing to shower. *Id*. The USPO recovered four cellular telephones in the residence's bathroom (where the shower was running). *Id*. In Elder's kitchen, the USPO observed multiple dust masks and rubber gloves, and recovered multiple plastic bags containing either chunky white or brown substances and a digital scale, hidden in a compartment under a cabinet. *Id*. Because the DEA suspected that the white and brown substances contained fentanyl, law enforcement did not conduct any field tests of the substance at that time. *Id*. Inside Elder's home, the USPO also recovered $23,531 in U.S. currency, three hydraulic presses (one of which had plastic wrap and tape), small red baggies, a spoon, and an address book that contained the names of at least four individuals that were currently being investigated, prosecuted,

or previously prosecuted by the U.S. Attorney's Office for the Western District of New York for narcotics violations. *Id*. The DEA's laboratory confirmed that the substances recovered from Elder's residence that day included approximately 92.7 grams of cocaine base and 117.8 grams of fentanyl. *Id*. at ¶ 10. The cocaine base seized had a street value of approximately $4,600 and the fentanyl had a street value of approximately $11,780. *Id*. On January 5, 2017, a federal grand jury returned the previously described three-count indictment against Elder. Dkt. 1.

**The Motion to Suppress**:

Prior to trial, Elder sought to suppress the evidence recovered from his residence on November 3, 2016. Dkt. 6.  A suppression hearing was held (Dkt. 24), and following such hearing, Magistrate Judge McCarthy issued a Report and Recommendation (R&R), which recommended that the evidence seized from Elder's residence should be suppressed based upon the Magistrate Judge's determination that the anonymous tips upon which the USPO relied to justify their search failed to establish reasonable suspicion to conduct such search. Dkt. 29.

The government filed objections to the R&R's recommendation that the evidence should be suppressed. Dkt. 33.  On February 13, 2018, this Court issued a Decision and Order (D&O) which adopted so much of the R&R as determined that the UPSO lacked reasonable suspicion to support their search but rejected the R&R's recommendation that the evidence should be suppressed.  Instead, this Court determined that the USPO was authorized to conduct a suspicionless search of Elder's premises.  Dkt. 37, pp. 2-4.

**Trial and Post-Trial Proceedings**

The jury trial commenced on July 17, 2018. Ten witnesses were called by the government, while two witnesses, including Elder himself, testified on behalf of defendant. On July 25, 2018, the jury returned a verdict convicting Elder of the three crimes with which he had been charged. *See* 17-CR-05-A, Docket Entries, dated 7/17/2018 through 7/25/2018; Dkt. 78.

On October 24, 2018, the USPO prepared the Pretrial Services Report that determined the defendant's total offense level of 34 included a two-level enhancement for Obstruction of Justice for his perjurious testimony at trial. Dkt. 95, ¶ 23. On October 31, 2018, this Court sentenced Elder to concurrent terms of 210 months of imprisonment on Counts 1, 2, and 3, followed by 4 years of supervised release. Dkt. 99.[4]

On June 11, 2019, Elder appealed of this Court's denial of his motion to suppress to the Second Circuit. *See* Second Circuit Case No. 18-3713, Dkt. 43. In rejecting Elder's contention that suppression was warranted, the Second Circuit, accepting this Court's determination that the anonymous tips did not provide reasonable suspicion for the search, reasoned as follows:

> While the Supreme Court has held that the suspicionless search of a parolee does not violate the Fourth Amendment, there the operative statute clearly stated that the parolee consented to search "with or without cause." *See Samson*, 547 U.S. at 846. Here, however, Elder's search condition does not explicitly state that he is subject to search

---

[4] As noted, this Court previously granted a § 3582 motion to reduce Elder's sentence from 210 months imprisonment to 187 months imprisonment. *See*, Footnote 3, *supra*.

without reasonable suspicion. Neither the Supreme Court nor our Court has addressed the issue of the reasonableness of a suspicionless search of a supervised releasee's home where the supervisee did not explicitly consent to such a search.

We need not, however, decide the issue here. Even assuming that Elder's Fourth Amendment rights were violated because he did not validly consent to the suspicionless search, suppression was not warranted in light of the totality of the circumstances. Weighing the "incremental deterrent" of excluding the evidence found in Elder's home against "the substantial social costs extracted by the exclusionary rule, "we conclude that, even absent reasonable suspicion and assuming a Fourth Amendment violation, the district court did not err in denying the motion to suppress. *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987).

Dkt. 108, pp. 6-7;  *United States v. Elder*, 805 F. App'x 19, 22 (2d Cir. 2020).

On April 13, 2020, Elder subsequently petitioned the Second Circuit for a rehearing *en banc*, which the Circuit Court denied on May 7, 2020. *See* Second Circuit Case No. 18-3713, Dkt. 87 and  90. On May 15, 2020, the Second Circuit issued its mandate affirming Elder's conviction. Dkt. 108; *see also* Second Circuit Case No. 18-3713, Doc. No. 92.

Elder filed a petition for writ of certiorari with the United States Supreme Court on October 9, 2020. *See* Second Circuit Case No. 18-3713, Dkt. 93. On January 11, 2021, the Supreme Court denied Elder's petition. *See* Second Circuit Case No. 18-3713, Dkt. 94.

Following the issuance of the Second Circuit mandate, Elder filed several *pro se* motions seeking: the return of U.S. currency, cell phones, and a USB device seized from him during the November 3, 2016, search of his residence (Dkt. 109); and the production of certain law enforcement reports (Dkt. 110 and 116).  On January 25,

2021, Elder filed his motion vacate under 28 U.S.C. § 2255.  Dkt. 125, 127.  As already described, a slew of additional *pro se* motions followed.

## II.    ANALYSIS

This Court will address Elder's *pro se* motions in the order in which they were filed.

### A. Motion to Return Seized Property (Dkt. 109)

In his initial *pro se* motion filed on June 29, 2020, Elder, citing Rule 41(g) of the Fed.R.Crim.P., sought return of $23,531.00 in U.S. Currency, certain cell phones, and a USB device seized from his residence during the November 3, 2016, search of his residence conducted by the USPO and the DEA.

As to the seized currency, the record demonstrates that the funds were forfeited administratively on March 7, 2017, several years before Elder's *pro se* Rule 41 motion was even filed. Dkt. 118.  The record further demonstrates that despite receiving actual notice of such administrative forfeiture proceeding against the currency, Elder never filed a claim for it. *Id*.  Since the currency has already been forfeited and since he was convicted of the crime for which his property was subject to forfeiture, *see*,  28 U.S.C. § 2680(c)(4), his claim for the currency is foreclosed.  *Diaz v. United States*, 517 F.3d 608, 613–14 (2d Cir. 2008).

As to the cellular telephones and the USB device, the government's proffered reason for refusing to return such items—set forth in its response (Dkt. 118) which was filed while Elder's petition for a writ of certiorari was pending before the Supreme

Court—was the pendency of such proceeding.  Dkt. 118, p. 16.  Those proceedings

are over, however, and thus, so too is the need for the Government to preserve such

items for evidentiary purposes.

> To prevail on a Rule 41(g) motion, the moving party must demonstrate that: (1) the party is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended. Yet, after the conclusion of a criminal proceeding, the evidentiary burden for a Rule 41(g) motion shifts to the Government because there is a presumption that the person from whom the property was allegedly taken has a right to its return. The government may rebut the presumption by proving it has a legitimate reason for retaining the property.

*United States v. Nunez*, No. 20-CR-239, 2022 WL 16707359, at *1 (S.D.N.Y. Nov. 4,

2022)(alterations, citations, and quotations omitted).

Here, there is nothing in the record to suggest that such devices constitute

contraband.  Further, the Government has not established that it has a legitimate

reason to retain the phones or the USB device.  Accordingly, to the extent they are

still in possession of the government, Elder is entitled to their return.[5]

Thus, this Court **DENIES** so much of Elder's motion (Dkt. 109) as seeks return

of the currency seized from him on November 3, 2016, and **GRANTS** so much of the

---

[5] This Court has authority to order the return of property pursuant to Rule 41(g) even after the conclusion of criminal proceedings.  Indeed, it does so here.  However, this Court is <u>not</u> permitted—in the event the property is "for whatever reason, … not available for Rule 41(g) return"— to order the United States to pay money damages. "Such monetary awards are barred by sovereign immunity."  *Adeleke v. United States*, 355 F.3d 144, 151 (2d Cir. 2004).

motion as seeks return of the cell phones and USB device seized from him on November 3, 2016.

**B. <u>Motion to Compel the Government to Produce Information and Documents</u> (Dkt. 110 and 116)**

On June 29, 2020, Elder filed a *pro se* motion to compel the government to produce tangible information and documents, which demanded that the government provide non-testifying witness statements to him and alleged that he would not have been convicted at trial had he had possessed such statements. Dkt. 110. On August 6, 2020, Elder filed a supplemental motion in support of that original motion to compel. Dkt. 116.

Specifically, Elder's motions seek to compel the government to turn over any reports memorializing an apparent interview (or interviews) that a Drug Enforcement Administration agent had Elder's former girlfriend, Ms. Leah Molina. Dkt. 110. The basis for Elder's request apparently derives from the trial testimony of DEA Special Agent David Turner, who testified during the government's case-in-chief that the DEA interviewed Ms. Molina on two occasions. Dkt. 110, p.2.  According to Elder, Ms. Molina was the person who planted the drugs at his residence and was the source of the anonymous tip that led to the search of his house.  *Id*.  In responding to such motion, the Government correctly observes that to the extent that Ms. Molina did not testify as a witness at trial, it had no obligation to turn over any report pertaining to her prior statements to law enforcement. Dkt. 117, pp. 6-7; *see*, *United States v. Rigas*, 583 F.3d 108, 125-26 (2d Cir. 2009) (no obligation for the Government to produce the

statements of individuals who are not testifying at trial); *United States v. Jackson*, 345 F.3d 59, 76 (2d Cir. 2003) (holding the Jencks Act "does not normally mandate disclosure of statements made by a person who does not testify" (citations omitted)); *see also*, *United States v. Stergo*, No. 23-CR-20 (ER), 2023 WL 3451381, at *4 (S.D.N.Y. May 15, 2023)("for nontestifying Government witnesses, the Jencks Act is inapplicable, and the Government need not produce the witness' prior statements.").

Indeed, the Government's only obligation to turn over the prior statements of non-testifying witnesses arises when such statement contains exculpatory material. "There is no obligation for the Government to produce the statements of individuals who are not testifying at trial.  However, in the event a non-testifying witness's statement contains exculpatory information or information that would impeach the credibility of a Government witness, that material is subject to disclosure pursuant to *Brady* and *Giglio*."  *United States v. Stewart*, No. 19-CR-101-LJV-MJR, 2019 WL 5288000, at *6 (W.D.N.Y. Oct. 18, 2019).

In its response to Elder's motion to compel, the Government, while denying that it was in possession of any *Brady* material, nevertheless indicated that it nevertheless recognized its obligation to provide any *Brady* material in this case, even after the verdict. Dkt. 117, p. 9.  Such good faith representation that it has complied with its obligations and will continue to do so provides a sufficient basis for this Court to deny Elder's motion to compel. *United States v. Avenatti*, 559 F. Supp. 3d 274, 285 (S.D.N.Y. 2021).  Except for bare speculation, Elder offers nothing to suggest that his

former girlfriend had evidence favorable to him, and we have no reason to doubt that the Government has—as it stated it would—fully complied with its *Brady* obligations.

Thus, this Court **DENIES** both Elder's motion to compel (Dkt. 109) and his motion to grant (Dkt. 116).

## C. Motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (Dkt. 125, 127)

Two weeks after the Supreme Court denied his petition for certiorari, Elder filed a motion (Dkt. 125) and memorandum in support (Dkt. 127) seeking to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. His motion alleges two separate claims: (1) that the Second Circuit's analysis of the exclusionary rule in deciding his appeal was improper; and (2) that Elder's trial counsel rendered ineffective assistance of counsel for failing to explain to him that he would be subject to the obstruction of justice sentencing enhancement for committing perjury. Dkt. 127, pp. 5, 16. Both claims lack merit. .

### 1. The Exclusionary Rule and Party Presentation Claim

First, Elder alleges that the Second Circuit, in addressing his direct appeal, violated the "party presentation principle" by concluding that, "even assuming" that the non-consensual, suspicionless search of Elder's residence violated his Fourth Amendment rights, suppression is nevertheless unwarranted. Specifically, the Circuit determined that "[w]eighing the 'incremental deterrent' of excluding the evidence found in Elder's home against 'the substantial social costs extracted by the exclusionary rule,' we conclude that, even absent reasonable suspicion and assuming

a Fourth Amendment violation, the district court did not err in denying the motion to suppress. *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987)." Dkt. 108, p.7.

Elder cites *United States v. Sineneng-Smith*, 590 U.S. 371 (2020), a case that was decided by the Supreme Court on May 7, 2020—a week before the issuance of the Second Circuit's mandate in this case—in support of his contention that the Second Circuit in deciding the case as it did, violated the party presentation rule. Dkt. 127, pp. 5-16. Contrary to Elder's assertion, however, the party presentation holding in *Sineneng-Smith* is inapposite here.

In *Sineneng-Smith*, the defendant challenged her convictions on constitutional grounds. However, the Supreme Court found that the Ninth Circuit, "departed so drastically from the principle of party presentation as to constitute an abuse of discretion," by "radical[ly] transform[ing]" the case presented by the parties. *Id*. at 375, 379-382. Elder's claims regarding *Sineneng-Smith* and party presentation principle are not cognizable under § 2255 because the Fourth Amendment claim was previously raised and addressed in Elder's direct appeal. *See United States v. Elder*, 805 F. App'x 19, 22 (2d Cir. 2020) (observing that the exclusion of evidence "is not a necessary consequence of a Fourth Amendment violation"). The party presentation principle states that "in both civil and criminal cases, in the first instance and on appeal . . . we rely on the parties to frame the issues for courts and assign to courts the role of the neutral arbiter of matters the parties present." *Greenlaw v. United States*, 544 U.S. 237, 243 (2008). That was done here; the issue that the parties presented to both this Court and the Second Circuit (and decided by each Court) was the same—

12

whether any Fourth Amendment violation arising from the warrantless and suspicionless search of a releasee's home ought to result in the suppression of the evidence recovered from it.

Elder asks this Court to disregard the purpose of § 2255 relief, disrupt the structure of the appellate process, and overturn his conviction based on arguments which the Second Circuit has already considered and rejected. Even if Elder's Fourth Amendment claim were not procedurally barred, it is without merit.

As previously mentioned, "[t]he party-presentation principle…restricts courts from *raising* new issues. The principle does not say that once an issue has been raised and responded to, a court must render its decision in accordance with the position of one of the parties. Courts have always had authority to resolve raised issues as fairness requires." *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022) (emphasis in original; citation omitted); *accord Novella v. Westchester Cnty*., 661 F.3d 128, 147 (2d Cir. 2011) (adopting a third approach after rejecting the parties' positions). "The party presentation principle is supple, not ironclad. There are no doubt circumstances in which a modest initiating role for a court is appropriate." *United States v. Sineneng-Smith*, 590 U.S. at 376.

Here, in affirming Elder's conviction and this Court's view that the evidence obtained as a result of the search at issue in this case was not subject to suppression, the Circuit simply provided an alternate basis upon which to affirm this court's

judgment.[6]    Without question, the Second Circuit has the authority to uphold the validity of a judgment "on any ground that finds support in the record." *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995); *see also Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 560 (2018) (Court has "discretion to affirm on any ground supported by the law and the record that will not expand the relief granted below"); *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("[W]e do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.' " (quoting *Helvering v. Gowran*, 302 U.S. 238, 245 (1937)).  That authority includes the right, as the Second Circuit did in this case, to deny a suppression motion without deciding whether a Fourth Amendment violation occurred. *United States v. Ganias*, 824 F.3d 199, 209 (2d Cir. 2016) ("Because we conclude that the agents acted in good faith, we need not decide whether a Fourth Amendment violation occurred. We thus

---

[6] In its decision in this case, the Second Circuit, merely assumed that a Fourth Amendment violation occurred. As the Court put it, "[e]ven assuming that Elder's Fourth Amendment rights were violated because he did not validly consent to the suspicionless search, suppression was not warranted in light of the totality of the circumstances," Dkt. 108, p.7, and "[e]ven assuming Dyckman acted unreasonably in failing to conduct further investigation before executing the search, this is not the kind of flagrant or abusive police misconduct that warrants application of the exclusionary rule." *Id*. However, as the Circuit has recently stated with regard to the validity of suspicionless searches, "we hold that the imposition of a special condition of supervised release that allows for searches without individualized suspicion does not violate the Fourth Amendment and, thus, can be imposed if sufficiently supported by the record under the factors set forth in Section 3583(d)."  *United States v. Oliveras*, 96 F.4th 298, 311 (2d Cir. 2024).  Elder has a history of possessing illegal firearms. Regardless, in view of Elder's history and status as a supervisee with a suspicionless search condition, the Circuit's decision to determine—after performing the cost/benefit analysis required in *Herring v. United States*, 555 U.S. 135 (2009)—that application of the exclusionary rule was unwarranted, may hardly be considered error.

affirm the district court on an alternate ground.").  That is all that happened here.  No error occurred.

### 2.  Ineffective Assistance of Counsel Claim

Elder next claims that his trial counsel was ineffective by failing properly to inform him that "by testifying in in his own defense, he could and probably would receive a perjury enhancement" such that "there is no way that Elder would have taken that risk exposing himself to more prison time." Dkt. 127, p. 22.[7] Again, such claim is frivolous.

A defendant's right to counsel as guaranteed by the Sixth Amendment "is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970); *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish that counsel was constitutionally ineffective, a defendant must "(1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing profession norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." *Parisi v. United States*, 529 F.3d 134, 140 (2d Cir. 2008) (internal quotation marks omitted); *Strickland*, 466 U.S. at 688; *Vadas v. United States*, 527 F.3d 16, 20 (2d Cir. 2007). This presents "a high bar for a

---

[7] As indicated in his PSR, the enhancement Elder received because of his false testimony at his trial was the two-level upward adjustment for obstruction under Guidelines Section 3C1.1. Dkt. 88, ¶23. As the Supreme Court has explained, an enhancement for obstruction of justice is appropriate when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

defendant, as *Strickland* instructs courts to apply a 'presumption of effective performance.'" *United States v. Nolan*, 956 F.3d 71, 79-80 (2d Cir. 2020) (quoting *Greiner v. Wells*, 417 F.3d 305, 326 (2d Cir. 2005)).

Under *Strickland*'s standard for evaluating ineffective assistance of counsel claims, judicial scrutiny of a counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *Bell v. Cone*, 535 U.S. 685, 698 (2002). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

### a.  Counsel's Performance was Objectively Reasonable

Under the first *Strickland* prong of whether counsel's performance fell "below an objective standard of reasonableness", the court must determine whether his counsel's assistance was reasonable considering all the circumstances, and because of the difficulties in making this evaluation, the court "must indulge a presumption that his counsel's representation fell within the wide range of reasonable professional assistance." *Weingarten v. United States*, 865 F.3d 48, 52 (2d Cir. 2017) (quoting *Strickland*, 466 U.S. at 688, 694). In other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy." *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 689). Here, Elder cannot overcome that presumption.

First, Elder fails to overcome the strong presumption that his attorney's representation was not deficient in the light of prevailing professional norms. In conclusory fashion, Elder characterizes his counsel's alleged failure to counsel him against testifying as "completely unprofessional error" rather than acknowledging the perceived error as "a tactical or strategic matter." *See* Dkt. 127 p. 22. Contrary to this assertion, any recommendation by Elder's defense counsel to have Elder testify at trial was, per se, a tactical and strategic one.

It is well-established that "actions or omissions that might be considered sound trial strategy do not constitute ineffective assistance." *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999) (internal quotation marks omitted). The decision of whether to call any witnesses on behalf of a defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); accord *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) (stating "the tactical decision of whether to call specific witnesses - even ones that might offer exculpatory evidence - is ordinarily not viewed as a lapse in professional representation").  Here, defense counsel's strategy in calling Elder as a witness is patently obvious. As reflected in his motion for a directed verdict, defendant testified seeking to provide direct evidence to overcome the government's circumstantial evidence regarding his knowledge of the drugs in his house. Dkt. 82,

pp. 5-6 ("While it is acknowledged that alleged [c]ontrolled [s]ubstances were found in the residence of the defendant. There was no direct proof which connected the defendant to the alleged [c]ontrolled [s]ubstances. No witness testimony was produced to offer any direct observation of the defendant in the actual possession of the alleged controlled substances at any point in time. Further, neither DNA nor fingerprint evidence was offered by the government which could have, possibly, provided such direct proof. The Government's case was nothing more than speculation that the controlled substances found were actually the Defendant's. On the other hand, the defendant testified at trial that he had no knowledge of the presence of the alleged controlled substances and was unaware of their existence. His testimony stands uncontroverted.").

According to Elder, he also communicated to his attorney that his intention in proceeding with the trial was preserving the appellate process. Dkt. 127, p. 21. If Elder's "train of thought . . . [was] looking past the trial and towards the appeal process" as he claims, his attorney acted well within professional norms in proceeding with a litigation strategy that included having Elder testify regarding the challenged search and seizure. Dkt. 127, pp. 21-22. Further evincing a clear and cogent trial strategy, counsel also called Elder's mother, Sherrida Dawson, to testify. Dawson provided an explanation for the large amount of cash in Elder's possession that was seized during the search. Dkt. 94, p. 10. Therefore, examining the defense case in its totality—the cross-examination of government witnesses and the presentation of

Elder's and Dawson's testimony—counsel set forth a clear and cogent trial strategy, albeit one that was ultimately unsuccessful.

The decision to have Elder testify at his trial was a tactical one. Indeed, a criminal defendant's right to testify on his own behalf is a fundamental right. *Rock v. Arkansas*, 483 U.S. 44, 52–53 & n.10 (1987). "[A] defendant's right to testify[, however,] does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. at 96; *see*, *Nix v. Whiteside*, 475 U.S. 157, 173 (1986); *United States v. Havens*, 446 U.S 620, 626 (1980). Here, however, Elder fails to recognize that the enhancement he received was not the result of his decision to exercise his Constitutional right to testify on his own behalf but the result of his decision to testify falsely.

With respect to claims of ineffective assistance of counsel, many courts have held that counsel's failure to address the possibility of committing perjury or the consequences that could stem from doing so does <u>not</u> rise to the level of ineffective assistance. *See, e.g., Caldwell v. Morrison*, No. 1:22-CV-700, 2024 WL 1340550, at *17 (W.D. Mich. Mar. 29, 2024)(in rejecting defendant's claim that his counsel was ineffective for advising defendant to lie under oath, trial court observed, "[t]o permit a defendant to have a new trial for the reason he/she lied under oath, would make a mockery of our system of justice."), *certificate of appealability denied*, No. 24-1376, 2024 WL 4664647 (6th Cir. Sept. 12, 2024); *United States v. Evans*, Nos. 0:13-CR-22-DLB-REW, 0:17-CV-127-DLB-REW, 2018 WL 8334950, at *10 (E.D. Ky. June 1, 2018) (rejecting petitioner's claim of ineffective assistance for counsel' s failure to

19

advise him about the consequences of committing perjury because the petitioner swore to tell the truth before testifying), *report and recommendation adopted*, 2019 WL 1077371 (E.D. Ky. Mar. 7, 2019); *United States v. Wilkes*, Nos. 07cr330-LAB, 15cv2841-LAB, 2017 WL 6344799, at *11 n.8 (S.D. Cal. Dec. 12, 2017) ("Even assuming that [counsel] failed to warn Wilkes not to lie under oath, this doesn't amount to ineffective assistance or anything like it. All witnesses in all cases—most of whom are not represented by counsel at all—are on notice that they must tell the truth; the oath itself is sufficient to convey that."); *Stevens v. United States*, Nos. CV414-014, CR411-199, 2014 WL 7405470, at *3 (S.D. Ga. Dec. 29, 2014) ("Stevens blames his attorney for failing to advise him that it was a bad idea to lie under oath to a court of law. That's just laughable."); *Montas v. United States*, Nos. 8:11-cv-849-T-27TGW, 8:08-cr-271-T-27TGW, 2012 WL 5193413, at *5 (M.D. Fla. Oct. 19, 2012) ("Petitioner took an oath before testifying at the sentencing hearing averring that he would testify truthfully. Counsel's failure to mention the possibility of an obstruction enhancement under these circumstances does not rise to the level of ineffective assistance."); *United States v. Kelly*, Nos. 2:09-36-DCR, 2:12-7226-DCR, 2012 WL 4955193, at *10 n.6 (E.D. Ky. Oct. 17, 2012) ("An attorney is not ineffective for failing to advise a defendant not to lie under oath."); *Cleckler v. United States*, No. 2:08–CV–397–WKW, 2009 WL 1507538, at *13 (M.D.Ala. May 29, 2009) ("Defense counsel [ ] is not required to warn a defendant that testifying untruthfully could lead to a sentence enhancement for obstruction of justice, especially when the defendant has taken the oath."), *aff'd*, 410 Fed. Appx 279 (11th Cir. 2011); *Robertson v. United States*, 144 F. Supp. 2d 58, 67–68 (D.R.I. 2001) (concluding that counsel was not ineffective for

failing to advise the defendant that, if his testimony was found to be false, his sentence could be enhanced for obstruction of justice because the oath administered to the defendant informed him of his obligation to testify truthfully); *see also*, *United States v. Mandujano*, 425 U.S. 564, 581–82 (1976) ("Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth. It would render the sanctity of the oath quite meaningless to require admonition to adhere to it.") (*quoting United States v. Winter*, 348 F.2d 204, 210 (2d Cir.1965)).

Elder incompletely notes that the obstruction of justice enhancement which he received was based on the decision for him to provide testimony at trial. However, Elder did not receive a sentence enhancement for simply testifying; he received a sentence enhancement for committing perjury. See U.S.S.G. § 3C1.1 n.4 (B). The record in this case conclusively establishes that Elder made a conscious, deliberate, and calculated decision to provide false testimony before the jury to mislead the trier of fact. Elder's efforts failed, the jury roundly rejected his testimony, and the jury convicted him on all counts.  Under these circumstances, it is unreasonable for Elder to claim trial counsel was ineffective because Elder did not know that his own decision to provide false testimony could increase his prospective sentence. Elder's effort to insulate himself from his own deliberate actions (in providing perjurious testimony) by casting aspersions toward his attorney through a wholly speculative ineffective assistance of counsel claim will not be countenanced by this Court.

Not only is the decision whether to call the defendant as a witness at trial a tactical or strategic matter, it is a decision ultimately left to the defendant himself, and counsel must abide by defendant's decision on this matter. *Brown*, 124 F.3d at 79. Notably absent from Elder's submissions are even a suggestion, much less an allegation, that Elder did not want to testify in this case, that he was coerced in any way to do so, or that he wanted to exercise his 5th Amendment privilege against self-incrimination.  Instead, as demonstrated by the record in this case and observed by this Court who presided over the trial in this matter, Elder was fully and actively engaged with his counsel in preparing his defense at every stage of the proceedings and throughout the pendency of the case. Elder and his attorney collaborated and coordinated regarding the trial strategy and embarked on presenting a cogent defense theory of the case, including presenting defense evidence at trial. In sum, the totality of representation Elder's attorney provided him was well within the standard of representation a defendant is constitutionally owed.

### b.  Elder Fails to Demonstrate Prejudice

The second prong of the *Strickland* test focuses on whether counsel's allegedly deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. To satisfy the second prong of the Strickland test, a petitioner must show that there is a "reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding (in this case, the trial or sentencing) would have been different. *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id*.

In this case, Elder's attorney's allegedly deficient representation in failing to tell him that he would receive an increased sentence if he testified falsely did not prejudice him.  Notably, in his motion, Elder admits that his attorney "led Elder to believe that the only thing he would be losing by going to trial [wa]s the three points of acceptance of responsibility. Attorney [] never alerted Elder to the fact he would be exposed to the perjury enhancement." Dkt. 127, p. 23. However, it was not the conduct of his attorney (even if he counseled him to testify) which caused Elder to be prejudice (*i.e.,* to receive an enhanced sentence), it was Elder's own conduct—in failing to testify truthfully— that caused Elder to suffer prejudice.  Because his "counsel [di]d not deprive[] him of any substantive or procedural right to which the law entitled him…his claim d[oes] not satisfy the 'prejudice' component of the *Strickland* test."  *Williams v. Taylor*, 529 U.S. 362, 392–93 (2000); *see also, id*., at n.17 (recognizing that "[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.").

For the foregoing reasons, this Court denies Elder's claim of ineffective assistance of counsel.

Having failed to establish that the Second Circuit's analysis of the exclusionary rule in deciding his appeal was improper and/or that he received ineffective assistance

of counsel, this Court **DENIES** Elder's *pro se* motion (Dkt. 125, 127) to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.[8]

### D. Motion for Compassionate Release (Dkt. 144)

Elder next seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1).[9] Specifically, Elder maintains that the following extraordinary and compelling circumstances warrant reduction of his sentence: (1) a due process violation committed by the Second Circuit (Dkt. 144, pp. 2-5); (2) the conditions of incarceration in view of the Covid-19 pandemic (*Id*., at pp. 6-10); (3) the crack cocaine/powder cocaine sentencing disparity under the Sentencing Guidelines (*Id*., at pp. 10-13);  (4) the denial of his confrontation clause rights at trial (*Id*., at pp. 13-19); and (5) the use of acquitted/uncharged conduct in imposing sentence (*Id*., at pp. 19-24).   For the reasons which follow, this Court rejects Elder's request for compassionate release.

### 1.  The Law

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020)). The First Step Act, which modified 18 U.S.C. § 3582(c), allows the Court to modify a sentence upon a motion of either: (i) the Director of the Bureau of Prisons [BOP], or (ii) the defendant "after the defendant has fully exhausted all

---

[8] Having concluded that Elder's request for relief under § 2255, lacks merit, this Court will also denies all of Elder's subsequently filed motions which relate specifically to his § 2255 motion, *i.e.,* Dkt. 126, 131, 132, 137, 138, 142, 143, and 167.

[9] In March of 2024, this Court, did grant Elder's motion for sentencing relief under 18 U.S.C. § 3582(c)(2).  *See*, FN. 3, *supra*.

administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once exhaustion is established, courts have discretion under the First Step Act to grant compassionate release when (1) there are "extraordinary and compelling reasons" that warrant a sentence reduction, (2) the sentence reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and (3) the sentence reduction "is supported by the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Canales*, No. 16-CR-0212, 2020 WL 2319294, at *2 (S.D.N.Y. May 9, 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). "If any one requirement is not satisfied, the district court may deny the motion without considering the remaining requirements. *United States v. Hunter*, No. 21-1773, 2022 WL 2288688, at *1 (2d Cir. June 24, 2022) (citing *United States v. Keitt*, 21 F.4th 67, 72-73 (2d Cir. 2021) (*per curiam*)).  The defendant bears the burden of proving that he is entitled to compassionate release. *See United States v. Earlsey*, 568 F. Supp. 3d 298, 301 (W.D.N.Y. 2021).

District Courts can consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020); *see id*. at 236 (finding that "[b]ecause Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants [as compared to those brought by the BOP], Application Note 1(D) cannot constrain district courts'

discretion to consider whether any reasons are extraordinary and compelling"). "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation ... alone shall not be considered an extraordinary and compelling reason.'" *Id*. at 237-38 (emphasis and alteration in original) (quoting 28 U.S.C. § 994(t)).

If a defendant establishes both exhaustion and the existence of extraordinary and compelling circumstances, then the Court must also "consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." *United States v. Davies*, No. 17-CR-0057, 2020 WL 2307650, at *2 (E.D.N.Y. May 8, 2020) (citation omitted). ("Even if extraordinary and compelling reasons exist, they must outweigh the [Section] 3553(a) [F]actors to warrant sentence reduction." (citing 18 U.S.C. § 3582(c)(1)(A))).

Because Elder is proceeding *pro se*, the Court will construe his motion liberally, interpreting it "to raise the strongest arguments that [it] suggest[s]." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation omitted); *Donaldson v. United States*, No. 09-CR-321A, 2018 WL 703102, at *2 (W.D.N.Y. Feb. 5, 2018).  But, as the moving party, Elder still bears the burden of demonstrating his entitlement to early release. *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she

has the burden of showing that the circumstances warrant that decrease." (citations omitted)); *accord United States v. Earlsey*, 568 F. Supp. 3d at 301.

### 2. Analysis

As to exhaustion, Elder, on December 28, 2022, filed a request, with the warden of the BOP facility at which he was being held, seeking his compassionate release on largely the same grounds set forth in this motion before this Court. Dkt. 144, pp.31-32.  The warden denied such request on January 24, 2023. *Id*., p. 33. Thus, this Court concludes that Elder has exhausted his administrative remedies in seeking relief from prison authorities.

Finding exhaustion, this Court must next engage in two additional inquiries.

First, the Court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A); *see United States v. Jones*, 17 F.4th 371, 374-75 (2d Cir. 2021).  Section 3553(a) lists various factors a court must review when imposing a sentence, and include the following considerations: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "the need for the sentence imposed ... to provide the defendant with ... correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

Second, the Court must determine whether the person seeking release has "demonstrate[d] that his circumstances are indeed 'extraordinary and compelling' such that, considering these § 3553(a) factors, a sentence reduction is justified under § 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed." *United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021).

Court's analyzing a compassionate release request need not consider these two factors in any particular order. As the Second Circuit has recognized: "A motion under § 3582(c)(1)(A) must demonstrate both extraordinary and compelling reasons justifying release and that a sentence reduction is consistent with the sentencing factors set forth in § 3553(a), so a district court may deny a motion based solely on the latter without reaching the former." *United States v. McLean*, No. 22-1176(CON), 2023 WL 8253680, at *1 (2d Cir. Nov. 29, 2023), *cert. denied*, 144 S. Ct. 1376 (2024).

As previously mentioned, Elder identifies the following "extraordinary and compelling circumstances" as justifying the relief he seeks: (1) a due process violation committed by the Second Circuit (Dkt. 144, pp. 2-5); (2) the conditions of incarceration in view of the Covid-19 pandemic (*Id*., at pp. 6-10); (3) the crack cocaine/powder cocaine sentencing disparity under the Sentencing Guidelines (*Id*., at pp. 10-13);  (4) the denial of his confrontation clause rights at trial (*Id*., at pp. 13-19); and (5) the use of acquitted/uncharged conduct in imposing sentence (*Id*., at pp. 19-24).

### a. Elder's First, Fourth and Fifth Claims for Compassionate Release

Of the five claims Elder identifies as providing "extraordinary and compelling" reasons to reduce his sentence under § 3582, the first and the fourth are plainly

directed at the validity of Elder's current conviction, while the fifth is directed at the validity of his 2005-armed bank robbery conviction. *See*, Dkt. 88, ¶34.  As such, none of them may appropriately be deemed to provide an "extraordinary and compelling" reason to justify this Court's review of Elder's sentence under the compassionate release statute.

The Second Circuit recently observed:

> If Congress had intended to permit defendants to circumvent the strictures of 28 U.S.C. § 2255 by making challenges to the validity of a conviction cognizable on a compassionate-release motion, it would surely have said so. Absent such a clear declaration of intent, we conclude that since challenges to the validity of a conviction must be made under section 2255, they cannot qualify as "extraordinary and compelling reasons" under section 3582(c)(1)(A). Compassionate release is not a channel to habeas relief or an end run around the limitations of section 2255.

*United States v. Fernandez*, 104 F.4th 420, 430 (2d Cir. 2024).  To the extent that Elder's first, fourth, and fifth claims each seek to attack the validity of Elder's current (first and fourth claim) and prior (fifth claim) convictions, they do not qualify as "extraordinary and compelling reasons" the compassionate release statute. *Id*.

Instead, such claims may only be brought pursuant to § 2255.  Recognizing Elder's *pro se* status, this Court will consider his first and fourth claims—attacking his current conviction—and his fifth claim—attacking his prior 2005 conviction—"subject to the rules set forth in § 2255."  *Id*., at 432.

As to Elder's first claim (that the Second Circuit denied his due process rights), this Court, in deciding the merits of his timely filed § 2255 claim, has already rejected

his contention that his due process rights were violated by the Second Circuit's decision on direct appeal affirming this Court's denial of his motion to suppress. *See*, *Analysis*, Point C, *supra.*    Accordingly, that claim has already been rejected on its merits by way of this Court's decision on Elder's § 2255 motion.

As to Elder's fourth claim—that his conviction is invalid based upon a violation of his confrontation clause rights—and his fifth claim—that his 2005-armed bank robbery sentence was improperly enhanced based upon acquitted or uncharged conduct, neither claim was timely raised under § 2255.

Elder did not advance his fourth claim (Confrontation Clause claim involving his current conviction) until he filed his motion to amend his § 2255 motion on February 11, 2022.    Dkt. 142. Elder did not advance his fifth claim (alleging an improer sentencing enhancement in his 2005-armed bank robbery conviction) until filing his compassionate release motion in this case in March of 2023. Dkt. 144.[10]

As a matter of law, where a defendant has unsuccessfully petitioned for certiorari, his time to file a § 2255 motion expires one year after the certiorari denial.

---

[10] As best this Court can determine, Elder's fifth claim asserts that his 2005-armed bank robbery conviction was improperly enhanced based upon acquitted or uncharged conduct.  *See*, Dkt. 88, ¶34.  According to Elder, but/for such improper enhancement at his 2005 sentencing, he would not have been on supervised release at the time of the offense conduct in this case. *See*, Dkt. 144, pp. 19-24.  As with his first and fourth claims, since such claim seeks to attack the validity of (one of) Elder's conviction(s), it may not properly be considered an "extraordinary of compelling reason" under § 3582. *See United States v. Fernandez*, 104 F.4th at 430.  Moreover, since Elder first raised it in the compassionate release motion he filed in March of 2023—in a different case, nearly a decade-and-a-half after the conviction and sentence he seeks to challenge—it is without question untimely under § 2255, and therefore, it provides no basis for relief.

*See* 28 U.S.C. § 2255.  In this case, Elder's petition for certiorari was denied be the Supreme Court on January 11, 2021. *See* <u>Second Circuit Case No. 18-3713</u>, Dkt. 94. Thus, his deadline for filing, or timely supplementing, any claims under § 2255 expired on January 11, 2022.  While his timely filed § 2255 raised due process and ineffective assistance claims, these new claims are clearly distinct from those. "The Supreme Court has concluded that '[a]n amended habeas petition ... does not relate back ... when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.' " *Speed v. United States*, No. 04 CR. 336 PKC, 2013 WL 416026, at *2 (S.D.N.Y. Feb. 4, 2013) (quoting *Mayle v. Felix*, 545 U.S. 644, 650 (2005)).  "'If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.' " *Id*. (quoting *Mayle*, 545 U.S. at 662).  Here, since Elder's fourth and fifth claims were untimely raised they are rejected.

Thus, with regard to Elder's first, fourth, and fifth claims set forth in his compassionate release motion, neither § 3582 nor § 2255 provide Elder with any avenues for relief.

### b.  Elder's Second and Third Claims for Compassionate Release

As his second and third claims under his § 3582(c) motion, Elder cites two additional "extraordinary and compelling" reasons as justifying his request for a reduction of his sentence—the conditions of incarceration in view of the Covid-19 pandemic (hereinafter "second claim"), *see*, Dkt.144 at pp. 6-10, and the crack

31

cocaine/powder cocaine sentencing disparity under the Sentencing Guidelines (hereinafter "third claim"). *Id*., at pp. 10-13.

As to his second claim, Elder argues that the harsh conditions he experienced during the COVID-19 pandemic lockdown while in BOP custody amount to an "extraordinary and compelling" reason to reduce his sentence. Dkt.144 at pp. 6-10. Elder, however, fails to allege any unique conditions that only he suffered. Rather, he cites to general circumstances experienced by all inmates, which do not in and of themselves constitute extraordinary and compelling circumstances warranting relief. *See United States v. Salvatore*, 11-CR-359S, 2024 WL 1651700, at *5 (W.D.N.Y. Apr. 17, 2024) (rejecting argument that general conditions of confinement during the pandemic warrant relief); *United States v. Farmer*, No. 19-CR-427 (LTS), 2022 WL 47517, at *4 (S.D.N.Y. Jan. 5, 2022) ("While the Court is sympathetic to the poor conditions many prisoners have faced during the pandemic, generalized statements about the conditions of confinement do not constitute compelling reasons for compassionate release."); *United States v. Bryant*, No. 06-CR-17-LTS, 2021 WL 738838, at *3 (S.D.N.Y. Feb. 24, 2021) (finding that generalized conditions of confinement during the pandemic "are not unique to [defendant] and do not militate strongly in favor of finding there are extraordinary and compelling reasons for a sentence reduction"); *cf. United States v. Ramirez*, 571 F. Supp. 3d 40, 47 (S.D.N.Y. 2021) ("If the challenging conditions of confinement caused by the pandemic warranted a sentence reduction here, essentially every inmate who has been in BOP custody at any time since March 2020 would be entitled to a sentence reduction.");

*but see United States v. Lora*, 16 Cr. 44-5 (KPF), 2022 WL 1055749, at *5 (S.D.N.Y. Apr. 8, 2022) (finding that "pandemic-induced conditions of confinement *may* constitute 'extraordinary and compelling' circumstances warranting compassionate release, particularly for defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic" (emphasis in original)).

Under these circumstances, this Court concludes that Elder has failed to demonstrate that the conditions of his confinement during the COVID-19 pandemic created an "extraordinary and compelling" to justify a reduction of his sentence.

As his third claim, Elder argues that "if [he] had the benefit of being sentenced today with no distinction between cocaine base and cocaine powder, Elder would have received a sentence of …108 to 127 months, or roughly half the sentence…Elder is currently serving  now simply because of the crack cocaine disparity." *Id*., p. 11.  In support of Elder's claim, he cites a December 2022 memorandum issued by Attorney General Merrick Garland to all federal prosecutors regarding sentencing disparities in cases involving distribution of cocaine base (also known as "crack cocaine") and powder cocaine.  "That memo does not reflect a change in the law, but, at most, reflects the [former] Attorney General's disagreement with the law. Accordingly, the memo does not support [Elder]'s motion." *United States v. Douchette*, No. 10-CR-6058 CJS-2, 2024 WL 1640943, at *5 (W.D.N.Y. Apr. 16, 2024); *see*, Baranco v. United States, No. 20-CR-0135-6 (JMF), 2023 WL 2612215, at *2 (S.D.N.Y. Mar. 23, 2023) ("[N]othing in the Attorney General's December 16, 2022, memorandum provides the Court with authority to alter Baranco's sentence.")  Indeed, based upon the quantity

of crack he possessed, his conviction under Count 1 would still carry with it the identical mandatory minimum sentence, that it did when he was sentenced.

Moreover, Elder ignores several facts which this Court considered in imposing the sentence it did: that Elder was found to possess even more fentanyl than crack; that fentanyl is arguably a drug that is even more dangerous than crack; that drug quantity of fentanyl alone that he possessed (*i.e.*, 117.8 grams), *see*, Dkt. 88, ¶ 20, prescribed precisely the same base offense level as that applicable to the quantity of crack he possessed; and that his Guideline were further increased by factors—*i.e.,* maintaining a drug premises and obstruction, *see, id.*, ¶¶ 20 &23—  that had nothing to do with the type of drug he possessed.  Moreover, since Elder's base offense Guidelines were determined based upon the conversion of the substantial quantity of currency he possessed into marijuana, whether converted to crack or fentanyl made little difference under the Guidelines.

Under these circumstances, this Court concludes that Elder has failed to demonstrate that any crack-powder disparity under the Guidelines creates an "extraordinary and compelling" to justify a reduction of his sentence.

Even assuming *arguendo* that this Court determined that Elder compassionate release claims (whether considered individually or collectively) amounted to "extraordinary and compelling" circumstances, this Court would, based upon its consideration of the § 3553(a) factors, nevertheless decline to grant Elder's compassionate release request.  In that regard, the Court observes that while rendering its D&O granting Elder's motion to reduce his sentence under § 3582(c)(2),

this Court has recently had occasion to reconsider all the factors set forth in 18 U.S.C § 3553(a).  Dkt. 163, pp. 5-6.  In so doing, this Court there determined—as it does again here—"that for the same reasons that a sentence at just below the mid-point of the Guideline range was appropriate when Elder was initially sentenced in 2018, sentencing at such point of the new Guideline range—notwithstanding the arguments of both parties—remains appropriate here." *Id*.  Once again, the Court adheres to its prior conclusions that consideration of the § 3553(a) factors does not warrant any additional reduction of Elder's sentence. Elder's lengthy sentence was not a function of the sentencing disparity between crack and powder cocaine: it was a result of his involvement in dealing not only crack but deadly fentanyl; it was the result of an extensive criminal history, that includes three federal felony convictions—each of which involved his possession or use of illegal firearms; it was a result of his decision to lie under oath; and it was the result of his persistent and demonstrated unwillingness to refrain from committing crimes and to abide by conditions set by this Court. Elder committed the instant offense within 4 months from his release from prison, having served well-over a decade in custody.  Under all these circumstances, this Court concludes that exercising discretion to further reduce his already reduced sentence under the Fair Sentencing Act would be inconsistent with its aims and contrary to the provisions of § 3553(a).

III.    <u>**CONCLUSION**</u>

For these reasons, Elder's outstanding motions are resolved as follows:

Elder's motion to return seized property (Dkt. 109) is **DENIED IN PART** and **GRANTED IN PART**.  Specifically, so much of Elder's motion as seeks return of the currency seized from him on November 3, 2016, is **DENIED**, and so much of Elder's motion as seeks return of the cell phones and USB device seized from him on November 3, 2016, is **GRANTED**;

Elder's motion to compel (Dkt. 109) is **DENIED**;

Elder's motion to grant (Dkt. 116) is **DENIED**;

Elder's motion (Dkt. 125, 127) to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 is **DENIED;**

Elder's motion (Dkt. 131) to compel a response to his § 2255 motion is **DENIED**;

Elder's motion (Dkt. 137) for extension of time to file a reply to the government's response to his § 2255 motion is **DENIED AS MOOT**;

Elder's motion (Dkt. 138) for release from custody pending resolution of his § 2255 motion is **DENIED AS MOOT**;

Elder's motion (Dkt. 142) to supplement or amend his § 2255 motion is **DENIED**;

Elder's motion (Dkt. 143) to compel a response to his motion to supplement or amend his § 2255 motion is **DENIED**;

Elder's motion (Dkt. 167) to expedite a decision on his § 2255 motion is **DENIED AS MOOT**;

Elder's motion (Dkt. 126) to appoint counsel is **DENIED**;

Elder's motion (Dkt. 132) to withdraw his motion to appoint counsel is **DENIED AS MOOT**;

Elder's motion (Dkt. 144) for Compassionate Release is **DENIED;** and

Furthermore, and with respect to Elder's motions, including his § 2255 motion, no certificate of appealability shall issue because Elder has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."). Moreover, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962);

**IT IS SO ORDERED.**

s/Richard J. Arcara

_____

HONORABLE RICHARD J.  ARCARA
SENIOR U.S. DISTRICT JUDGE

Dated:  February 13, 2025
         Buffalo, New York.